A00A0617. PEPPERS v. THE STATE.
(530 SE2d 34)

ELDRIDGE, Judge.

Linda Kay Peppers appeals from the denial of her motion for new trial, which followed her May 1998 convictions for burglary, armed robbery, aggravated assault, and aggravated battery.[1] Peppers challenges the sufficiency of the evidence at trial and the trial court's denial of her extraordinary motion for new trial, which was based upon a witness' subsequent assertion that he had lied under oath at

---

[1] The aggravated battery conviction was merged with the aggravated assault upon sentencing.

Peppers' trial. We find that the evidence presented was sufficient to sustain the convictions and that the witness' recantation did not require a new trial. Accordingly, we affirm.

1. In three enumerations, Peppers asserts that the trial court erred when it failed to direct a verdict of acquittal. She claims that the evidence showed that she was merely present at the scene of the crimes and that she lacked any prior knowledge that a crime was to be committed. This assertion lacks merit.

> The standard of review of the denial of a motion for directed verdict of acquittal is that from *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). On appeal, the defendant no longer enjoys the presumption of innocence; moreover, an appellate court does not weigh the evidence or determine the credibility of witnesses, but only determines whether the evidence is sufficient for a rational trier of fact to find the defendant guilty beyond a reasonable doubt. In addition, conflicts in the witnesses' testimony are a matter for a jury to resolve. As long as there is some competent evidence, even though contradicted, on each element necessary to prove the State's case, the jury's verdict will be upheld.

(Citations omitted.) *Hubbard v. State*, 239 Ga. App. 632, 634 (2) (521 SE2d 678) (1999).

In addressing Peppers' assertions regarding her participation in the crimes, we note that,

> [u]nder OCGA § 16-2-20 (a)[,] every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime. One is concerned in the commission of a crime where the person either directly commits, intentionally causes another to commit, intentionally aids or abets the commission of, or intentionally advises or otherwise encourages another to commit the crime. While mere presence at the scene of the commission of a crime is not sufficient evidence to convict one of being a party thereto, presence, companionship, and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred.

(Citations and punctuation omitted.) *Bailey v. State*, 203 Ga. App. 133, 135 (1) (416 SE2d 151) (1992). See also *Hildebrand v. State*, 209 Ga. App. 507, 511 (4) (433 SE2d 443) (1993). Further, if the State presents sufficient evidence that the actors were involved in a conspiracy, i.e., the individuals had associated themselves together in a common design to do an unlawful act, "any act done in pursuance of

that association by any one of the associates would, in legal contemplation, be the act of each of them." *Ford v. State*, 163 Ga. App. 745, 746-747 (296 SE2d 85) (1982). See also *Culberson v. State*, 236 Ga. App. 482, 484 (512 SE2d 367) (1999).

The evidence in this case showed that, on February 23, 1998, Peppers and two friends, J. R. Carter[2] and Janan Hogan, met at a home in Atlanta. They left shortly thereafter in Hogan's car and drove through a "dope trap" in search of heroin and crack cocaine. Peppers admitted at trial that she is a heroine addict; that she was experiencing withdrawal symptoms; and that the little money she had given Carter to buy drugs "was not near enough to supply me [with heroin] for an entire day." After Carter, Peppers, and Hogan were unable to find a drug dealer, they drove up to Cherokee County to the home of the victim, who was an acquaintance of Carter's. Carter told Peppers that the victim would loan him some money so that they could buy drugs. On the way, they stopped at a store, and Peppers shoplifted two bottles of wine. She drank from one of the bottles in an attempt to alleviate the chills, nausea, and pain she was experiencing from heroin withdrawal.

Once they arrived at the victim's home, Carter approached the back door and knocked; Peppers and Hogan remained in the car. When Carter realized that no one was home, he broke the window of the back door and unlocked it from the inside. In the process, he severely cut his right hand in several places. Even though he wrapped one of the victim's shirts around the cuts, blood dripped throughout the house. Carter began picking up items from the house, including a "boom box" compact disc player, two albums of CDs, telephones, and a watch. Peppers met him inside the living room and helped him carry the items to the car. She claimed at trial that she did not notice the broken window, the blood and glass on the floor near the door, or the bleeding wounds on Carter's hand.

When Carter and Peppers got back to the car, the victim drove down the driveway in his truck. Carter approached the victim and asked him if he would loan them some money. When the victim refused, Carter went back to the car to get a wine bottle. Carter then hit the victim twice over the head with the full wine bottle, knocking the victim to the ground and causing severe and permanent injuries. While the victim was unconscious, Carter went through his pockets and took approximately $350 in cash. He handed the money to Peppers and told her to count it. Carter testified that Peppers did nothing to stop him from harming the victim, and there was no evidence

---

[2] A few days prior to testifying at Peppers' trial, Carter pled guilty to burglary, armed robbery, aggravated assault, and aggravated battery.

that she called 911 or did anything else to aid the victim after the attack.

Carter, Peppers, and Hogan left the scene and went back to Atlanta, where they used $200 of the stolen cash to purchase crack cocaine for Carter and heroin for Peppers and Hogan. Peppers admitted at trial that she used the heroin shortly after it was purchased. Another individual testified that he saw Peppers and the others when they returned from buying the drugs and that they had "a bunch of dope," boom boxes, CDs, and "stuff like that" in the car. Peppers told him that they had "robbed the dope man."

These facts clearly show that Peppers was actively involved in a common scheme with Carter and Hogan to secure money with which to buy illegal drugs; that she knew or should have known that the criminal acts were being committed; that she actively participated in the burglary; that she failed to prevent or to render aid after the remaining crimes; and that she enthusiastically shared in the proceeds resulting from the criminal acts. We find that there was sufficient evidence for a jury to find that Peppers was involved in the crimes beyond her "mere presence." Therefore, the trial court did not err in denying her motion for directed verdict.

2. In her remaining enumeration, Peppers contends that the trial court erred in denying her extraordinary motion for new trial. In her motion, Peppers asserted that Carter had contacted her attorney and admitted fabricating some of his testimony at trial. This Court has held, however, that simply because

> a material witness for the State, who at the trial gave direct evidence tending strongly to show the defendant's guilt, has since the trial made statements even under oath that his former testimony was false[ ] is not cause for a new trial. Declarations made after the trial are entitled to much less regard than sworn testimony delivered at the trial. This difference in value must be recognized, so long as there has been no conviction of perjury. Provision is made for setting aside verdicts resting on perjury, but there must first be a conviction. The only exception to the rule against setting aside a verdict without proof of a material witness' conviction for perjury, is where there can be no doubt of any kind that the State's witness' testimony in every material part is purest fabrication.

(Citations and punctuation omitted.) *Johnson v. State*, 236 Ga. App. 764, 765 (513 SE2d 291) (1999). See also *Miller v. State*, 226 Ga. App. 509, 515 (4) (486 SE2d 911) (1997).

While a witness' recantation may impeach his prior testimony, it

is not the type of evidence that proves the trial testimony was the "purest fabrication." *Miller v. State*, supra; see also *McKnight v. State*, 211 Ga. App. 653 (1) (440 SE2d 249) (1994). As noted in *Johnson v. State*, supra, the type of evidence that proves, beyond any doubt, that trial testimony was false is evidence which removes the issue of the witness' credibility, such as evidence that shows that the witness' trial testimony was physically impossible. See, e.g., *Fugitt v. State*, 251 Ga. 451, 452-453 (1) (307 SE2d 471) (1983).

No such evidence was presented in this case. During the hearing on the extraordinary motion, Carter testified that he had lied at Peppers' trial in order to secure a more favorable sentence for himself. In fact, Carter testified that *all* of his testimony against Peppers was false, including testimony that corroborated Peppers' own admissions. Notably, Carter's trial testimony was consistent with his statements to police and his admissions accompanying his guilty plea just days before Peppers' trial.

After hearing Carter's testimony, the trial court denied the extraordinary motion. The trial court found that "there is no evidence that Carter fabricated anything other than his testimony at the motion [hearing] itself." This conclusion is supported by the record. Therefore, the trial court properly denied the motion.

*Judgment affirmed. Blackburn, P. J., and Barnes, J., concur.*

DECIDED FEBRUARY 17, 2000.

*Abernathy & Ballinger, Eric A. Ballinger*, for appellant.
*Garry T. Moss, District Attorney, Cecelia Harris, Assistant District Attorney*, for appellee.